# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

GABRIEL TYRONE SMITH,

                              :

        Petitioner,                        Case No. 1:11-cv-083

                              :         District Judge S. Arthur Spiegel
      -vs-                                 Magistrate Judge Michael R. Merz

WARDEN, Warren Correctional
  Institution,

                              :

        Respondent.

---

## SUPPLEMENTAL REPORT AND RECOMMENDATIONS

This habeas corpus case under 28 U.S.C. § 2254 is before the Court on Petitioner's Objections (Doc. No. 16) to the Magistrate Judge's Report and Recommendations (the "Report," Doc. No. 15), recommending that the Petition be dismissed with prejudice. The General Order of Reference for the Dayton location of court permits a magistrate judge to reconsider decisions or reports and recommendations when objections are filed.

### Ground One

In his First Ground for Relief, Petitioner asserts ineffective assistance of trial counsel with two sub-claims: (1) failure to timely disclose a witness, leading to the witness's exclusion, and (2) failure to object to the prosecutor's misstatement of evidence in closing.

**Excluded Witness Sub-claim:**

The Twelfth District Court of Appeals considered this claim on direct appeal. It assumed the failure to disclose was deficient performance, but found no prejudice because a lay witness testified to the same fact that the excluded investigator would have testified to – that shots were fired at the vehicle in which Petitioner was present. The Magistrate Judge recommended dismissing this sub-claim because the court of appeals' conclusion of lack of prejudice was not an unreasonable determination of the facts (Report, Doc. No. 15, PageID 1430).

Petitioner now objects that the "excluded witness was hired as an expert" (Objections, Doc. No. 16, PageID 1447). This does not make the court of appeals' decision unreasonable. The witness's testimony was never proffered in the state court record, so it is impossible to say if he would have been qualified as an expert and permitted to testify. Even now Petitioner does not identify what the supposed expertise was. The court of appeals assumed the witness, an "investigator," would have testified there were bullet indentations on the outside of the car, but again a lay witness had already testified to that effect. Based on the record before it[1] which included no proffer, the court of appeals' decision was not unreasonable.

**Prosecutorial Misconduct Sub-claim:**

The Twelfth District Court of Appeals concluded it was not deficient performance to fail to

---

[1] This Court can only look to the evidence before the state courts in determining whether their decision was or was not reasonable under 28 U.S.C. § 2254(d). *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388, 1400-01, 179 L. Ed. 2d 557 (2011).

object to a misstatement of the evidence by the prosecutor in closing argument.  The Magistrate Judge concluded this was not an unreasonable application of the law or determination of facts (Report, Doc. No. 15, PageID 1431.)

As Petitioner notes in his Objections (Doc. No. 16, PageID 1448), the court of appeals reported that it was "troubled" by the prosecutor's comments which Petitioner now says should have drawn an objection.  *State v. Smith,* 2009 Ohio 5517, 2009 Ohio App. LEXIS 4648, ¶ 105 (Ohio App. 12th Dist. Oct. 19, 2009).  Actually, it went further and held that the remarks were "clearly improper." *Id.* at ¶ 106.  It found no prejudice because the trial judge instructed the jury that closing arguments were not evidence and in any event the jury acquitted Petitioner of the firearm specification of firing from a vehicle. *Id.* at ¶ 107.  The Report found that this was not an unreasonable application of relevant Supreme Court precedent (Report, Doc. No. 15, PageID 1430-1431).

Petitioner now says that if the court of appeals found itself "troubled" on plain error review, it would likely have reversed if there had been a contemporaneous objection (Objections, Doc. No. 16, PageID 1448.)  This does not follow logically.  In order to have found prosecutorial misconduct sufficient to warrant reversal, the court of appeals would have had to find both that the prosecutor's comments were improper and that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168 (1986); *Wogenstahl v. Mitchell*, 668 F.3d 307, 327-328 (6th Cir. 2012), *citing Smith v. Mitchell,* 567 F.3d 246, 265 (6th Cir. 2009); *Bates v. Bell*, 402 F.3d 635, 640-41 (6th Cir. 2005); *Kincade v. Sparkman*, 175 F.3d 444 (6th Cir. 1999) or whether it was "so egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir. 1979);

*accord Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir. 1979), *aff'd sub nom*, *Watkins v. Sowders*, 449 U.S. 341 (1981); *Stumbo v. Seabold*, 704 F.2d 910 (6th Cir. 1983).  The court of appeals went further than to say they were "troubled"; they found the prosecutor's remarks "clearly improper." But had an objection been made, they still would have had to apply the second part of the constitutional test – what was the effect on the trial?  Their determination of lack of prejudice is entitled to AEDPA deference.  When that deference is applied, the conclusion of lack of prejudice is reasonable.

## Ground Two

In Ground Two Petitioner pleads his claim of prosecutorial misconduct on the merits.  The Report recommends dismissal because of the procedural default in failing to make a contemporaneous objection (Report, Doc. No. 15, PageID 1436).  Alternatively on the merits, the court of appeals found that, even without the prosecutor's comments, it was likely Petitioner would have been convicted of felonious assault as an aider and abettor.  The Magistrate Judge found this conclusion was not unreasonable. *Id.*

Petitioner objects that both the Magistrate Judge and the court of appeals are speculating: "[W]hen a defendant speculates, he is called on it.  When a court speculates, it goes unacknowledged." (Objections, Doc. No. 16, PageID 1448.)  Actually the court of appeals recited at length the facts on which the aiding and abetting convictions rests:

> [*P4]  In the early morning hours of September 19, 2007, Demarco was at a bar with his girlfriend, Lori Glover, and his best friend, Jeremy McGuire. According to Demarco, present at the bar were appellant, Teray D. Marshall, Jr., and Terry Fuller. Lori and Jeremy

-4-

saw appellant and Terry at the bar but did not see Teray or Shadeed Barnett (or were not sure if they were there). Terry was wearing orange. While at the bar, Demarco got into a fight with Brandon Smiley, a friend of Teray. After the fight, Lori drove to the projects with Demarco and Jeremy and dropped them off. It was Demarco's intention to recruit friends to go finish the fight with Brandon.

 [*P5]  An aerial view of the projects shows that it is comprised of three parallel streets: Cribbs Street to the north, Weaver Street to the south, and McGuire Street between the two; running perpendicular to these streets are Main Street to the east, and Vance Street to the west. Of importance to the case is a grassy area that is a joint backyard for apartment buildings on McGuire and Weaver Streets.

 [*P6]  At the projects, Demarco and Jeremy met up with Demetrius Davis (Lori's brother), James Wilson, Jerrel Wright (Demarco's cousin), and Zeph Jennings. Demetrius and Zeph lived on Weaver Street, Jerrel on McGuire Street. As the group was getting together, Demetrius, James, Jeremy, and Zeph noticed a blue Ford Taurus with dark tinted windows on Weaver Street driving around the projects. According to Jeremy, as soon as he, Lori, and Demarco arrived at the projects, the Taurus "pulled up right behind" them on Weaver Street before driving off. Jeremy and Zeph did not see who  [**4]  was driving the Taurus. By contrast, Demetrius and James both testified that appellant was driving the Taurus. James further testified that his sister, Cierra Wilson, was a passenger in the Taurus. Cierra testified appellant was driving the Taurus in which she was a passenger.

 [*P7]  After dropping off Demarco and Jeremy, and as she was driving south on Main Street, Lori noticed that appellant was following her in a blue Taurus. Lori eventually pulled over and the two briefly conversed from their cars. Lori did not see anybody else in the Taurus. During their conversation, appellant received a phone call. Appellant told the caller "that's all you got to say. I'm on my way," then left and drove away towards the projects. Lori does not know who the caller was.

 [*P8]  Meanwhile, at the projects, Demarco and his friends were on McGuire Street where they ran into James' cousin who was crying because her boyfriend, Deontae Robinson, had beaten her up. Upon seeing Deontae walking down the street, James, along with Jeremy and Demarco, beat up Deontae. Either during the beating or immediately after, Demetrius observed a silver Nissan vehicle drive on McGuire Street before turning on Vance Street. 1 In the Nissan

vehicle were Teray, Shadeed, and a third person wearing an orange shirt. Shadeed was driving the car; Teray was in the front passenger seat.

FOOTNOTES

1 Demetrius testified observing a silver Nissan "Altima." However, the silver Nissan vehicle recovered after the shootout was a silver Nissan Maxima and was rented to Shadeed. The license plate number on the recovered vehicle was identical to the license plate number on the rental agreement signed by Shadeed. Nissan Altimas and Nissan Maximas are similar in appearance.

[*P9] Soon after, gunfire erupted. Both Demetrius and James testified that Teray came around the corner from Vance Street and started shooting while walking down McGuire Street. Jerrel testified that the shooting started on McGuire Street near Vance Street; it then was coming from everywhere. By the look or the way it was shooting rapidly, Demetrius and James believed Teray was using an automatic weapon. By the sound of the gunfire, Jerrel believed automatic weapons were used. Before the shooting started, James heard Teray say "I see you all bitch ass n***s." Zeph similarly heard someone scream out of a car "I see you all n***s." Demarco heard someone yelling "there they go," followed by a "bunch" of automatic gunfire. Demarco did not know who started the gunfire, or where or why it started.

[*P10] As gunfire erupted, Demarco and his friends scattered and began to run. Demetrius ran towards Main Street with the intention to retreat into the woods to the east of Main Street. He was in the grassy area between McGuire and Weaver Streets when he saw the Taurus come around on Main Street and stop; the front passenger window rolled down; shots were fired from the car. Demetrius retreated and hid behind a shed until he heard the Taurus leave. He then ran across Main Street to safety. Shooting was still going on after he had crossed Main Street. Demetrius observed the Taurus driving south on Main Street. Demetrius never saw appellant holding or firing a weapon.

[*P11] Zeph ran through the grassy area towards Main Street. However, the Taurus came around and shots were fired from the car.

-6-

Zeph retreated; as he was running away from Main Street, he saw Demarco. At that moment, someone in orange started shooting at Zeph who retreated to safety into a house.

 [*P12] Jeremy was shot in his right hand before he ran. He does not know who shot him. After being shot, Jeremy ran through the grassy area, ran across Main Street diagonally, and fell behind bushes.

 [*P13] Demarco ran and hid behind a shed in the grassy area near Main Street. Gunfire and yelling continued. As he was hiding, he saw Jeremy, his best friend, being chased and fired at by two people. Demarco believed the two shooters were Teray and Shadeed. Jeremy was sprinting towards Main Street. Although the two shooters had already run past him, Demarco came out of hiding and yelled to distract them. The shooters turned towards him and started shooting. Demarco was shot in the stomach in the grassy area near Main Street and fell to the ground. Someone then came to him and smacked him with a gun, stating "You're going to die bitch ass n***." Demarco recognized Teray's voice. Another individual with Teray told Teray "to come on because the police was coming." Demarco did not know if the second voice was Shadeed's voice. Demarco testified that at that point he was in and out of consciousness. This was confirmed by Officer Ken Minear who testified Demarco was unable to communicate as he was in and out of consciousness. Demarco testified that during the shootout "there was a lot of automatics going off;" more than two shooters were involved as there was too much gunfire to come solely from Teray and Shadeed.

 [*P14] Jerrel ran through the grassy area. At that point, the shooting was coming from everywhere, including from the direction of Weaver Street. Upon seeing his cousin Demarco fall, Jerrel started running towards Demarco when someone came around shooting. Jerrel retreated and was running back to his house when he was shot in the leg. Jerrel did not see who shot him and could not identify any of the shooters; all he "saw" were bullets.

 [*P15] James ran as soon as Teray started shooting, and retreated to the grassy area where he ended up near Jerrel. James also observed shots fired from the Taurus; at that time, the Taurus was on Main Street between McGuire and Weaver Streets. While he was in the grassy area, James observed Demarco get shot in that same grassy area near Main Street, fall to the ground, and being subsequently hit with a weapon by Teray. Shadeed, who was then with Teray, told Teray: "Here come the police. Come on." Thereafter, Jerrel was shot

by a shooter wearing an orange shirt. James was with him. After being shot, Jerrel pushed James into an apartment building. James does not know who shot Demarco. James never saw appellant holding or firing a weapon.

[*P16] As stated earlier, Cierra (James' sister), testified she was a passenger in the blue Taurus driven by appellant. Appellant picked her up after he left the bar (she was not at the bar). On their way to the projects, they picked up Terry who sat in the back passenger seat. When they arrived at the projects, a fight between a few people was taking place. She subsequently heard gunshots. According to Cierra, Terry fired a weapon out of the window of the Taurus before getting out of the car. Cierra never saw a weapon on appellant. During the shootout, the Taurus was fired upon. Appellant and Cierra then left the projects, going north on Main Street (away from Lafayette Street).

[*P17] During her testimony, Cierra freely admitted she did not want to testify; stated "since I have to say what I said previously, I said [appellant] picked up Terry Fuller," "If I was to say that it was Terry Fuller 100 percent, [Terry] was sitting behind me," "This is what I'm going to say," and several similar statements; did not know if she had truthfully testified during a prior proceeding; admitted telling appellant when he was incarcerated that she did not know anything; could not say "for a fact 100 percent that it was [Terry who got in the car];" and testified that "maybe nobody was shooting out, maybe people was just shooting at us."

[*P18] Holly Cummings, a resident on McGuire Street, was playing cards that morning when she heard gunfire and people yelling. Looking out her back window into the grassy area, she observed a man with a big weapon walking through the grassy area towards Main Street. The weapon was not a handgun. The man was not firing the weapon but was holding it up in sight.

[*P19] Lori Griffis, a resident on Weaver Street, was awakened by the shootout. Looking out her front door, she observed a blue Ford Taurus with dark tinted windows on Weaver Street with the back passenger door open. The Taurus was facing the west. Griffis heard two men arguing and yelling somewhere in the area, with one saying "You're going to do me like that n***;" shots were then fired from the Taurus through the open back passenger door into the grassy area. The Taurus then drove "real fast" past her house to the end of the street, drove back to its original location in reverse, and finally drove

-8-

back past her house and turned onto Vance Street. Griffis never saw anyone exit the Taurus. Griffis testified that when the Taurus drove in reverse, she could hear gunfire coming from the grassy area; in fact, a couple of bullets hit her storage shed located in the grassy area.

[*P20]  A police officer trained in weapons as a SWAT team member was on light duty that morning taking 911 calls. The officer testified they received over 30 calls regarding the shootout and that while talking to callers, he could hear gunfire, both automatic and semi-automatic.

[*P21]  At the scene, the police recovered 26 shell casings from three different calibers, to wit: seven 9 mm shell casings at the corner of Weaver and Main Streets; five .40 caliber shell casings in the grassy area near Vance Street; and 14 7.62x39 shell casings in the grassy area and at the corner of Weaver and Main Streets. The recovered shell casings all appeared to be "fresh" casings. No shell casings were found at the corner of Vance and McGuire Streets. Several bullet strikes and/or holes were found on the ground, telephone poles, and buildings, including inside a residence on McGuire Street. The crime scene covered three blocks. The weapons used in the shootout were never recovered.

[*P22]  The silver Nissan vehicle was recovered that day; it was parked on Vance Street and was rented to Shadeed. Although searched, nothing was recovered from the vehicle. The Taurus was found later that day on 17th Avenue. There was no damage to the body of the car or the windows. There were no shell casings in the car; "the interior was very clean." The Taurus was not processed for gun powder residue; a detective testified powder residue tests are no longer considered reliable. A bullet was found lodged inside the top of a rear passenger door of the Taurus. Detective David Swartzel testified the bullet appeared to have been fired from the Taurus (and not at the Taurus).

*State v. Smith, supra.*  To summarize, there was ample testimony that Petitioner was driving the Taurus and that others inside that car were engaged in the gunfight.  It is hardly speculative to project an aiding and abetting conviction on this evidence.

## Ground Three

In Ground Three Petitioner asserts constitutional error in the refusal to sever his trial from that of his co-defendants. The Magistrate Judge found this claim procedurally defaulted on three separate bases. The Objections mention nothing about those findings, but merely reargue the merits of this Ground for Relief. For the reasons given in the Report, the Court should not reach the merits.

## Ground Four

In Ground Four Petitioner complains of the introduction of prior bad acts and an inflammatory photograph. The Report found this claim procedurally defaulted by failure to present it on appeal to the Ohio Supreme Court. Petitioner offers no objection to the procedural default analysis.

## Conclusion

Having considered the Objections, it is again respectfully recommended that the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with the Magistrate Judge's conclusions on Grounds One, Three, and Four, Petitioner should be denied a certificate of appealability on those claims. Because the Butler County Court of Appeals itself found the claim of prosecutorial misconduct a relatively close call, Petitioner should be granted a certificate of appealability on Ground Two and permitted to appeal *in forma pauperis*.

-10-

March 29, 2012.

s/ **Michael R. Merz**
United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).